Filed 8/4/16  In re Devyn S. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re DEVYN S. et al.,<br><br>Persons Coming Under the Juvenile Court Law. | B267423<br>(Los Angeles County<br> Super. Ct. No. DK10194) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MELISSA S.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court for Los Angeles County, Amy M. Pellman, Judge.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, and Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

In this dependency case, the juvenile court made jurisdictional findings under Welfare and Institutions Code[1] section 300, subdivision (c), with regard to appellant Melissa S.'s (mother) three children, Devyn, Arianna and Jayden. In its subsequent disposition order, the juvenile court removed Devyn from mother's custody and ordered that mother and their father, Justin A. (father)[2] have joint physical and legal custody of Arianna and Jayden. Mother challenges the jurisdictional order as to Arianna and Jayden, contending there is insufficient evidence to support the court's finding that they were at substantial risk of suffering emotional harm absent intervention by the juvenile court. She also challenges the juvenile court's disposition order with regard to Arianna and Jayden, arguing that the court effectively removed them from her custody (because she previously had sole custody), without making requisite findings for removal. We affirm both orders.

### BACKGROUND[3]

On January 12, 2015,[4] the Los Angeles County Department of Children and Family Services (the Department) received a referral regarding Devyn, Arianna

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

[2] Michael B., Devyn's alleged father, did not appear in the dependency case; neither he nor father is a party to this appeal.

[3] Because mother does not challenge the jurisdiction or disposition findings as to Devyn, our discussion of the facts is limited to the facts necessary to review the findings as to Arianna and Jayden.

[4] All dates refer to the year 2015 unless otherwise specified.

and Jayden.[5]  The reporting party, who said she had known the family for several years, reported that Jayden had posted on Facebook that her grandfather was hitting Devyn too hard.  The reporter also said that there were ongoing problems in the home, because mother is "somewhat of a perfectionist about everything" and is "extremely 'over the top' in everything she does."  She observed that mother is "extremely uptight, stern and rigid with her children," and "constantly ridicules and belittles" them.  At the time of the referral, Devyn was 13 years old, Arianna was seven, and Jayden was five.

Six weeks later, the Department received another referral regarding the family.  The referral related to an incident on the evening of February 26.  According to the referral, Devyn reported that he and his maternal grandfather had an altercation.  He said that grandfather started pushing him, and in response, Devyn took grandfather's glasses.  Grandfather then hit Devyn with a closed fist several times and held him on the couch so he could not breathe.  Devyn ran out of the house and went to a neighbor's home; Devyn had run to the neighbor's home three other times due to physical abuse.

A social worker from the Department spoke to the neighbor at 12:30 a.m. on February 27.  The neighbor told the social worker that Devyn came to her door, barefoot and upset, and said that his grandfather had punched him in the mouth and choked him.  Devyn told her that he did not want to return to mother's home.  The police arrived and took him away; she did not know where.  She noted that Devyn had gone to a few of the neighbors at other times with stories of neglect by mother.

---

[5]  There had been four previous referrals in 2013 and 2014, alleging physical abuse and/or general neglect as to Devyn and risk of abuse as to Arianna and Jayden.  The Department determined that those referrals were either unfounded or inconclusive.  However, due to Devyn's reported behavioral problems, a voluntary family maintenance case was opened in 2014 to put services in place for the family.

The social worker then went to mother's home, accompanied by a sheriff's deputy, and spoke with mother and grandfather. Mother told him that Devyn had thrown away his medication and "had been spiraling for the last two days." She said that she had been trying to get the other two children to bed when Devyn hit one of them. She took the two younger children upstairs to her bedroom and locked the door. Devyn was trying to get into her bedroom, so she asked grandfather to keep him away. She heard a commotion downstairs, and later, when she left the bedroom, she found that Devyn had left the home. She said she asked grandfather to go look for Devyn, but he could not find him.

Grandfather told the social worker that he had been staying with mother for two months waiting for medical treatment. He said that he heard mother call out to him, asking him for help because she was trying to take the younger children to bed. Mother asked him to block Devyn, who was trying to get into her room. He said that Devyn was upset, and threw a bottle at him. He tried to calm Devyn down, and they started to wrestle, and then Devyn ran off outside. Mother came downstairs and asked grandfather to go find Devyn; he tried, but could not find him.

Devyn was taken by the police to a psychiatric hospital.[6] The following day, he was interviewed by CSW Kyle, the social worker assigned to this case. Devyn told the social worker about the incident. CSW Kyle observed that the left side of Devyn's mouth was swollen, which was consistent with Devyn's description of the incident. When asked whether grandfather had ever done something like that to him before, Devyn said he had not, but that grandfather had hit his sister before. Devyn also told CSW Kyle that he did not want to return home, and that he wanted to live with his uncle Gordon, with whom he had lived before.

---

[6] Devyn had been in a psychiatric hospital twice before.

4

That same day, CSW Kyle went to mother's home. Mother was not there when the social worker arrived, but grandfather allowed the social worker into the home. CSW Kyle told grandfather about Devyn's allegations. Grandfather denied the allegations, and said that mother, who had locked herself and the younger children in the bedroom, had called out for help with Devyn; he said only tried to restrain Devyn, and that Devyn broke free from him and ran out of the house.

Mother entered the home with Arianna and Jayden while CSW Kyle was speaking with grandfather. Mother's demeanor was "difficult" and "somewhat hostile." When asked about the incident with Devyn, mother said that Devyn had dumped his medication the day before. She said that she was trying to get her daughters ready for bed, and needed a time out from Devyn, so she tried to close the door. Devyn did not want her to close the door, so she called to grandfather to help her with Devyn. Mother denied that grandfather harmed Devyn, but admitted that she had not seen Devyn after the incident.[7] CSW Kyle asked if she could speak with Arianna and Jayden privately, but mother would allow her to speak with them only if she were present. Both children denied any abuse by mother or grandfather, and said they were happy with mother.

Over the next few days, CSW Kyle spoke with friends of the family, neighbors, and others who had contact with the family. Most reported concerns about mother's treatment of Devyn, primarily regarding emotional abuse. Although they generally did not report significant mistreatment of Arianna and Jayden, a longtime family friend expressed concern for the girls, because their attitudes had changed recently, and they were not as happy as they used to be.

---

[7]    In fact, mother made no contact with Devyn or the hospital for at least four days after he was admitted.

5

On March 10, CSW Kyle contacted father and told him she was investigating allegations of abuse and neglect against mother. Father told the social worker that he had had minimal contact with Arianna and Jayden, and that the last time he saw them was the previous spring. He said that mother uses the children as leverage and that, from his experience with mother during their relationship, mother had a bad temper, and "her instincts in the heat of the moment go to very drastic measures." However, he told the social worker that he had never known mother to be abusive toward their daughters, and that they have never reported any abuse or neglect to him when he has spoken with them on the telephone.

On March 17, the Department filed a petition under section 300. The petition alleged counts under section 300, subdivisions (a), (b), and (j) as to all three children based upon grandfather's alleged physical abuse of Devyn and mother's failure to protect (counts a-1, b-1, and j-1), mother's alleged physical abuse of Devyn (counts a-2, b-2, and j-2), and mother's failure to properly supervise Devyn, who allegedly hit Arianna (counts b-3 and j-3). The petition also alleged a count under section 300, subdivision (c) as to Devyn based on mother's alleged emotional abuse (count c-1). At the detention hearing, the juvenile court found a prima facie showing under section 300, subdivisions (a), (b), and (c) as to Devyn, and under subdivisions (a), (b), and (j) as to Arianna and Jayden. The court ordered Devyn detained, and Arianna and Jayden released to mother.

In advance of the jurisdiction hearing, father's counsel submitted several exhibits, including a declaration by father and a request for modification of custody, which father had filed in a pre-existing family law case. In his declaration, father described mother's behavior during his previous visits with their daughters. He stated that mother would allow him to see the girls only if she were present, and used those visits to try to reestablish her relationship with father.

6

When he would call to speak with the girls, he could hear mother telling them what to say, often criticizing him. On many occasions, she refused to allow him to see them at all. Sometimes, she would agree to let him see them, but then change her mind on the day of the agreed meeting. In the summer of 2012, mother had agreed to let father take the children to a pool party, but on the day of the party, mother would not respond to father's texts or calls. When she contacted him the next day, she told father he could see the children only if he agreed to spend the night at her house; when he refused, she threatened not to allow any more visits. By 2013, mother refused to allow father to visit with or speak to his daughters at all. At times, he went to her house in unsuccessful attempts to see them; when he knocked on the door, he could hear mother hushing the children, but she refused to open the door or answer the phone. One time, he happened to see his children at a Wal-Mart, but when mother saw him, she grabbed the girls and ran away; the girls saw him and cried.

On the first day of the jurisdiction hearing, mother presented testimony from two witnesses – herself and a child care provider who had taken care of Devyn and was currently taking care of Arianna and Jayden. Devyn's counsel called Gordon S. (Devyn's great uncle, with whom Devyn lived for a while) as his sole witness. All of the testimony focused on Devyn, and did not directly address any issues with regard to Arianna and Jayden. The hearing was not completed on that day, and was continued for several weeks.

In two memos submitted to the juvenile court on the day of the continued hearing, the Department reported on issues regarding visits with mother and Arianna and Jayden since the previous hearing. CSW Schafnitz, the new assigned social worker, had left several messages for mother, but mother had not returned any of them. When another social worker went to mother's home on July 22 for an unannounced bimonthly meeting and knocked on the door, she heard one of the

7

girls call out to mother. The child looked out the window, but disappeared behind the blinds when the social worker smiled at her. The social worker stood at the front door for 10 minutes, and telephoned mother to let her know she was there, but mother did not answer her phone or open the door. The Department noted that mother's lack of cooperation and failure to allow the social workers access to her children had been a continuing problem. The Department also reported that according to father, mother had not been giving father the requested number of hours for his visits. He said that on one occasion he wanted to take the girls to the beach, but mother would not allow it; he later discovered that the girls just stayed home that day and watched television. Finally, father told the social worker that every time he got the children, they were very hungry.

At the continued hearing, the juvenile court heard further testimony from mother and Gordon S., as well as closing arguments from all counsel; the matter was continued once again.

At the next hearing, held on August 6, the court made the jurisdictional findings. The court observed that "[t]hroughout these [proceedings], the mother has been difficult to reach. She has failed to make herself available for the interview by the Department. And she has made it difficult to be in touch with her and set up visits for [father] or to allow the Department to see the younger children. It appears the reports of mother needing to be in control, controlling of her every situation have some truth." The court addressed the issues regarding mother's relationship with Devyn, and then discussed Arianna and Jayden: "Arianna and Jayden are living in a war zone. They are constantly taken into mother's room and locked in while Devyn is banging on the door, begging to get in, throwing or destroying items in the home. They are witnessing physical violence between mother and Devyn and severe emotional outbreaks. [¶] The court believes that while these two little girls may be well taken care of on the

8

outside and are currently showing no signs of real distress, there is real and substantial risk of harm to these girls if Devyn were to be returned home at this time." After noting that section 300, subdivision (c) "applies to children who are at substantial risk of suffering serious emotional damage, even when there is insufficient evidence that they have suffered actual harm," the court dismissed all of the counts under section 300, subdivisions (a), (b), and (j), and amended and sustained count c-1 as follows: "On multiple prior occasions, [Devyn's] mother, Melissa [S.], engaged in behavior that emotionally aggravated Devyn to the point Devyn was out of control and/or psychiatrically hospitalized resulting in both severe emotional distress and physical harm. Devyn has suffered and is at risk of continuing to suffer serious emotional damage as evidenced by severe depression, withdrawal, and aggressive behaviors towards himself and others, as a result of mother's inability to control both her own and Devyn's behaviors, which has resulted in harm to the child and places his sisters, Arianna [A.] and Jayden [S.], at future risk of harm."[8]

Before the court could make its disposition order, father's counsel asked for a short break to conference on the matter. When the hearing resumed, counsel for Arianna and Jayden told the court that an issue had been raised as to whether the court could change a custody order; counsel indicated that the research she conducted during the break showed there was some controversy over mother's assertion that the court could not change such an order. The court continued the disposition hearing to allow counsel to meet and confer regarding the disposition and to submit briefs on the custody issue.

---

[8] We note that the minute order for this hearing includes the court's finding that Devyn is a person described by section 300, subdivision (c), but does not include the court's finding with regard to Arianna and Jayden.

9

At the continued disposition hearing, mother's counsel argued that under section 361, subdivision (c), a dependent child cannot be taken from the physical custody of his or her parent with whom the child was residing at the time the petition was filed unless the juvenile court finds clear and convincing evidence of certain specified circumstances. The court responded that section 361, subdivision (c) did not apply to this case because the court did not intend to take custody away from mother, but was merely changing custody and visitation, which the court was empowered to do. The court then declared Arianna and Jayden dependent children of the court and ordered that mother and father would have joint legal and physical custody of them, under supervision of the Department.[9]

Mother timely filed a notice of appeal from the jurisdiction and disposition orders.

## DISCUSSION

In her appellant's opening brief, mother contends there was insufficient evidence to establish jurisdiction over Arianna and Jayden under section 300, subdivision (c); in a supplemental opening brief, mother contends the juvenile court did not have the authority to order joint custody without complying with the removal provisions of section 361, subdivision (c). Neither contention has merit.

---

[9] We note that the minute order for the disposition hearing incorrectly states that Arianna and Jayden were declared dependent children under section 300, subdivisions (a), (b), and (j). As previously stated, the reporter's transcript of the previous hearing showed that the court dismissed all counts under those subdivisions and sustained an amended count under section 300, subdivision (c) as to all three children.

A. *Jurisdictional Order*

Under section 300, subdivision (c), a juvenile court may adjudge a child to be a dependent of the court if "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian." (§ 300, subd. (c).) "In the trial court, child welfare authorities have the duty to establish the jurisdictional facts by a preponderance of the evidence. [Citation.] On appeal, however, '"we must uphold the [trial] court's [jurisdictional] findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings. [Citation.]"' [Citation.]" (*In re D.P.* (2015) 237 Cal.App.4th 911, 917.)

In her opening brief, mother concedes that the court correctly found that Devyn was suffering from emotional harm due to mother's conduct. She also notes that the juvenile court aptly observed that Arianna and Jayden were "living in a war zone" due to Devyn's and mother's interactions, and concedes that the girls would be at risk of emotional harm if Devyn were returned to the home. But she asserts there is no evidence that Arianna and Jayden would be subject to substantial risk of harm without Devyn in the home. Since Devyn had been detained from mother at the time of the jurisdiction hearing, and since "the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm" (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824), mother argues there was no basis to find that Arianna and Jayden were dependent children of the court under section 300, subdivision (c).

The primary fault in mother's argument is her assumption that the "war zone" the juvenile court described was solely due to Devyn's behavior. There was

substantial evidence suggesting that mother's behavior was the primary cause. For example, although mother saw Devyn as violent and aggressive, others who had interactions with him described him as a "really good kid." In fact, it was reported that Devyn displayed no such violent and aggressive behavior while he lived with his uncle Gordon, both before and after the petition was filed, and that he was able to get off of his medication while living with him. In contrast, family members and longtime family friends described mother as extremely uptight and controlling, with a bad temper, who tended to take drastic measures; many of those friends expressed concern for the children. Mother's conduct with the Department social workers and with father was consistent with those observations. She was hostile toward the social workers and would not allow them to have access to the girls, refusing to answer the door or her phone when a social worker went to her home. She would not let father visit with his daughters without her being present, and arbitrarily cut off all contact with him – even going so far as to take the girls and run away from him when he happened to see them at a store.

Although there was little evidence that mother was emotionally abusive toward Arianna and Jayden while Devyn was living with them (although one longtime  family friend reported that she constantly ridiculed and belittled all of her children, and another noted that the girls' attitudes had changed and they were not as happy as they used to be), the juvenile court reasonably could infer that with Devyn removed, mother would turn her emotionally abusive behavior toward one or both of them. (See, e.g.,  *In re Edward C.* (1981) 126 Cal.App.3d 193, 203 ["court could reasonably infer that the father, with [physically abused daughter] removed, would substitute either one or both of the boys as an object of his ruthless drive for religious perfection"].) This inference is especially strong in this case, since mother, like the mother in *In re D.P.*, *supra*, 237 Cal.App.4th 911, has attempted to minimize her role in causing Devyn's emotional harm and thus fails

12

to recognize the risks of her behavior.  In short, we conclude that substantial evidence supports the juvenile court's jurisdictional finding with respect to Arianna and Jayden.

B.    *Custody Order*

In her supplemental opening brief, mother argues that the juvenile court acted without authority by ordering a change in custody for Arianna and Jayden – from mother's sole custody to joint custody with father.  She contends that this change in custody constituted a removal of the children from her custody, which may be ordered only if the juvenile court makes one of the findings required under section 361, subdivision (c), which was not done in this case.

Section 361, subdivision (c) provides in relevant part that "[a] dependent child shall not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of" certain circumstances, such as a substantial danger of harm to the child if he or she were returned home, and there are no reasonable means to protect the child without removing him or her from the parent's physical custody.

Mother's argument might have some merit if the juvenile court had awarded father sole custody of Arianna and Jayden, thus taking them from the physical custody of mother.  But the court did not do that.  It merely ordered that mother *share* custody of the girls with father.  Therefore, section 361, subdivision (c) did not come into play.  Instead, the juvenile court acted under the authority of sections 302 and 362.

Section 302 provides that "[a] juvenile court may assume jurisdiction over a child described in Section 300 regardless of whether the child was in the physical custody of both parents or was in the sole legal or physical custody of only one

parent at the time that the events or conditions occurred that brought the child within the jurisdiction of the court." (§ 302, subd. (a).) It requires that both parents, whether custodial or noncustodial, be notified of all proceedings. (§ 302, subd. (b).) And it provides that "[w]hen a child is adjudged a dependent of the juvenile court, any issues regarding custodial rights between his or her parents shall be determined solely by the juvenile court, as specified in Sections 304, 361.2, and 362.4, so long as the child remains a dependent of the juvenile court."[10] (§ 302, subd. (c).)

Section 362 provides that "[i]f a child is adjudged a dependent child of the court on the ground that the child is a person described by Section 300, the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child, including medical treatment, subject to further order of the court." (§ 362, subd. (a).)

Clearly, under these statutes, the juvenile court has broad discretion to make or modify custody orders in accordance with the best interests of the dependent child. Mother's interpretation of section 361, subdivision (c), if accepted, would significantly limit that broad discretion, and prevent the court from modifying a custody order even if it determined it was in the child's best interests to do so, unless the specific circumstances set forth in section 361, subdivision (c) were

---

[10]    Section 304 provides that while a child is under the jurisdiction of the juvenile court, all issues regarding custody must be heard by the juvenile court. Section 361.2 applies when the court *removes* a child from a custodial parent; if the noncustodial parent requests custody, the court must place the removed child with that parent unless doing so would be detrimental to the child, and may order that the parent become the legal custodian and terminate dependency jurisdiction or assume custody subject to, or under the supervision of, the juvenile court. Section 362.4 provides that when the juvenile court terminates its jurisdiction over a dependent child, if a custody order had been entered in any superior court, the juvenile court may issue an order determining custody of, or visitation with, the child, and that order will continue until modified or terminated by a subsequent order of the superior court.

found.  We decline to interpret section 361, subdivision (c) in that way.  Instead, that provision must be interpreted to apply only when the juvenile court removes a dependent child entirely from a custodial parent's physical custody.

## DISPOSITION

The juvenile court's jurisdictional and disposition orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


MANELLA, J.

15